John J. Hebert (#l010633)
Mark W. Roth (#010708)
Wesley D. Ray (#026351)
**POLSINELLI SHUGHART PC**
Security Title Plaza
3636 North Central Avenue, Suite 1200
Phoenix, AZ  85012
Telephone:  (602) 650-2000
Facsimile: (602) 264-7033
E-Mail:  jhebert@polsinelli.com
E-Mail:  mroth@polsinelli.com
E-Mail:  wray@polsinelli.com
Attorneys for Debtors

Cathy L. Reece (#05932)
Keith L. Hendricks (#012750)
**FENNEMORE CRAIG, P.C.**
3003 N. Central Ave., Suite 2600
Phoenix, Arizona  85012-2913
Telephone: (602) 916-5343
Facsimile: (602) 916-5543
E-Mail: creece@fclaw.com
E-Mail: khendricks@fclaw.com
Attorneys for Textron Financial Corporation

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| ILX RESORTS INCORPORATED, *et al.*, | Case No. 2:09-bk-03594-RTB |
| | Case No. 2:09-bk-03595-RTB |
| Debtors. | Case No. 2:09-bk-03596-RTB |
| | Case No. 2:09-bk-03598-RTB |
| Address:        160 Portal Lane | Case No. 2:09-bk-03599-RTB |
|                 Sedona, AZ 86336 | Case No. 2:09-bk-03600-RTB |
| | Case No. 2:09-bk-03601-RTB |
| This filing applies to: | Case No. 2:09-bk-03603-RTB |
| | Case No. 2:09-bk-03604-RTB |
|     ☒ ALL DEBTORS | Case No. 2:09-bk-03605-RTB |
|     ☐ SPECIFIED DEBTORS | Case No. 2:09-bk-03606-RTB |
| | Case No. 2:09-bk-03608-RTB |
| | Case No. 2:09-bk-03609-RTB |
| | Case No. 2:09-bk-03610-RTB |
| | Case No. 2:09-bk-03612-RTB |
| | Case No. 2:09-bk-03617-RTB |
| | |
| | Joint Administration under |
| | Case No. 2:09-bk-03594-RTB |

**DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF
REORGANIZATION BY TEXTRON FINANCIAL CORPORATION AND
DEBTORS**

This document is the Disclosure Statement of Textron Financial Corporation ("Textron Financial") and ILX Resorts Incorporated ("ILX"), ILE Sedona Incorporated, ILX Tourist Station Incorporated, ILX-Bruno LLC, Los Abrigados Partners Limited Partnership, Genesis Investment Group Inc., Puerto Penasco Vacations Destinations, S. de R.L. de C.V., Premiere Development Incorporated, Sea of Cortez Premiere Vacation Club, S. de R.L. de C.V., Rocky Point Genesis Incorporated, VCA Tucson Incorporated, VCA South Bend Incorporated, VCASB Partners General Partnership, First Piggy LLC, Harbor Southwest Development Inc., and ILX Bell Rock Incorporated (collectively the "Debtors"), as debtors-in-possession in the above-entitled jointly-administered Chapter 11 cases. This Disclosure Statement is submitted by Textron Financial and Debtors, through their attorneys, pursuant to Section 1125 of the Bankruptcy Code, in support of the Joint Plan of Reorganization filed by Textron Financial and the Debtors ("Plan").[1]

## I. **INTRODUCTION**

Section 1125(b) prohibits the solicitation of acceptances or rejections of a plan of reorganization unless such plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as may reasonably be deemed sufficient to allow creditors and interested parties to make an informed decision regarding the Plan.

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtors, their assets and liabilities, have

---

[1] The Joint Plan is the result of a joint effort by the Debtors and Textron Financial to settle the various issues that have arisen out of Textron Financial's Stay Relief Motion and Objection to Debtors' Plan, among other things. In the event that the Joint Plan and the Sale contemplated by the Joint Plan are not approved by the Court and do not close, Debtors and Textron Financial reserve any and all of their rights and arguments and nothing herein or in the Joint Plan shall be deemed an admission by either party.

been prepared from information submitted by the Debtors and their retained professionals. The Debtors and other professionals employed by the Debtors have utilized all relevant, non-privileged information provided by the Debtors in preparing this Disclosure Statement and the Plan.

This Disclosure Statement contains information that may influence your decision to accept or reject the Plan. Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtors and Textron Financial are not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtors' financial books and records, has been reviewed by Debtors' management and great effort has been made by Debtors' management to ensure that all such information is fairly representative.

This Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement must be approved by the Bankruptcy Court after notice and a hearing pursuant to Section 1125(b). Once approved, the Disclosure Statement will be distributed with the proposed Plan for voting. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired class entitled to vote on the Plan. Impaired

classes entitled to vote on the Plan are those classes of claims whose legal, equitable or contractual rights are altered, as defined under Section 1124 of the Bankruptcy Code. An impaired class of claims is deemed to have accepted the Plan if at least two-thirds in amount of those claims who vote and more than one-half in number of those claims who vote have accepted the Plan. An impaired class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds in amount of the allowed interests who vote on the Plan.

Even if each class of creditors does not accept the Plan, the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code, so long as one impaired class of creditors accepts the Plan. This is referred to as the "cram down" provision. The failure of each class to accept the Plan could very well result in a conversion of this case to a Chapter 7 or dismissal of the Chapter 11, and the secured creditors repossessing their collateral and disposing of it in a commercially reasonable manner with no obligation to unsecured creditors.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a class has accepted the Plan.

## II.    SUMMARY OF PLAN

The Plan provides for (1) the Sale of substantially all of the assets of Debtors to a third party, (2) payment from the Sale Proceeds and cash on hand of all Allowed Administrative and Priority Claims and pre and post confirmation operating expenses, (3) payment of Allowed Secured Claims from the Sale Proceeds of the assets subject to their lien, (4) return of collateral to holders of certain Secured Claims, (5) creation of an ILX Liquidating Trust for the benefit of the Allowed Unsecured Claims, (6) transfer of certain real property, residual rights to proceeds, and other assets not sold to the ILX Liquidating Trust, (7) creation of a Stock Pool for the benefit of the holders of ILX Stock,  (8) transfer

to the ILX Stock Pool of $2.1 million, (9) retention of the corporate shell, the related income tax benefits, and certain merchant deposits for the ILX Stock Pool, and (10) the settlement and release of causes of action against Textron Financial and the allowance of its claim and the validity and priority of its security interests.

The Plan Proponents have received a stalking horse Sale offer for substantially all of the Debtors' assets from ILX Acquisition, Inc. for $29,672,251. The offer is being made by an unrelated third party entity that has no connection with any officer, director or shareholder of ILX. The Sale offer is subject to higher and better bids from other third parties which could provide more proceeds to be distributed under the Plan. In the event that any party other than ILX Acquisition, Inc. is the Buyer, its approved bid must provide at least the same amount of cash for pre and post confirmation operating expenses, administrative expenses, and priority claims, and the same payment to creditors, other than Textron Financial, (including funding the Liquidating Trust) and equity holders (including funding the Stock Pool) that would be made if ILX Acquisition Inc. were the Buyer, and any additional amounts required by any orders entered by the Court governing the Sale process. Additionally, to the extent that a Buyer other than ILX Acquisition, Inc. does not have an agreement with Textron Financial, it must pay Textron Financial's Allowed Secured Claim in full, in cash, on the Effective Date, or as otherwise agreed by the Debtors, Textron Financial and the Buyer. The Sale hearing will be held as a part of the Plan Confirmation hearing and the Sale will close only if the Plan is confirmed.

## III. <u>DEFINITIONS</u>

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## IV.   BACKGROUND, DEBTORS' OPERATIONS AND EVENTS PRECIPITATING THE CHAPTER 11

The information contained in this section was provided by the Debtors' management. The Debtor ILX was founded in 1986 and commenced implementation of its current operating and growth strategies in the fourth quarter of 1991. During the period from December 31, 1991 through December 31, 2008, ILX increased the number of ILX resorts from two to ten (excluding the Roundhouse Resort, the Carriage House, Scottsdale Camelback Resort and Los Abrigados Lodge), and increased its total inventory of sold and unsold Vacation Ownership Interests from 9,915 weeks to 33,292 weeks (including the Sea of Cortez Premiere Vacation Club, the Roundhouse Resort, the Carriage House, the Scottsdale Camelback Resort Vacation Ownership Interests and 19 additional Vacation Ownership Interests). According to Debtors' management, the Debtors total revenues, excluding estimated uncollectible revenue, increased from $6.1 million in 1991 to $42.8 million in 2008.

ILX also developed and implemented the Varsity Clubs concept. This concept entails ground-up development of urban vacation ownership properties strategically situated in tourist destinations that are accessible to major population centers near prominent colleges and universities. The first Varsity Club, VCA-South Bend, consisting of 86 units, is located approximately three miles from the University of Notre Dame in South Bend, Indiana. The second Varsity Club, VCA-Tucson, consisting of 60 units, is located approximately three miles from the University of Arizona in Tucson, Arizona.

Historically ILX had primarily marketed Vacation Ownership Interests in individual ILX resorts. Commencing in June 1998, the Company began marketing much of its inventory through membership interests in its proprietary branded Premiere Vacation Club.   Premiere Vacation Club offers purchasers a deeded one-week membership interest that may be used at any time between certain specified dates at any

one of the destinations included in Premiere Vacation Club, or may be split into multiple stays of shorter duration at any combination of such resorts. Vacation Ownership Interests in individual ILX resorts and in Premiere Vacation Club may be exchanged for stays at other resorts through the major national exchange networks in which ILX owners may participate, such as Interval International ("II") and Resort Condominiums International ("RCI"). ILX has also created a Varsity Clubs wing to recognize the University of Nevada-Las Vegas ("UNLV") at the Carriage House in Las Vegas.

The Debtors' Chapter 11 filings were precipitated by the dramatic deterioration of economic conditions commencing in the fourth quarter of 2007 and continuing thereafter, together with unanticipated reductions in credit facilities caused by instability in the credit markets. The Debtors' credit facility with one of its two primary lenders expired in June 2008 and was not renewed. On March 1, 2009, a loan from Textron Financial matured. The original maturity date of the loan was December 31, 2008 but was extended through February 2009 by two separate letter agreements. The Debtors and Textron Financial were unable to reach a mutually acceptable longer term extension of the loan. The Debtors assert that they filed the Petition to avert the foreclosure of certain assets and to preserve equity for Debtors' creditors and shareholders.

As a result of its bankruptcy filing and its status as a public company, ILX is periodically required to file various documents with, and provide certain information to, the Bankruptcy Court, including statements of financial affairs, schedules of assets and liabilities and monthly operating reports in forms prescribed by federal bankruptcy law, as well as certain financial information on an unconsolidated basis, and to file documents with the United States Securities and Exchange Commission. Reference is hereby made to one such document, the Annual Report Pursuant to Section 13 or 15(d) of the Securities Act of 1934 (Form 10-K) filed with the United States Securities and Exchange

Commission for the year ended December 31, 2009 (the "Annual Report") (Commission File Number 001-13855), as a source of detailed financial information. The documents filed with the Bankruptcy Court are not prepared for the purpose of providing a basis for an investment decision relating to the Company's securities, or for comparison with other financial information filed with the Securities and Exchange Commission. Such documents were prepared and filed by Debtors' management and Textron Financial disclaims any participation in such preparation and filing and makes no representations concerning the documents or the financial performance of the Debtors. Debtors' most recent Monthly Operating Reports prepared by Debtors' management are filed with the Bankruptcy Court and available through the Clerk of the Court or from the Plan Proponents.

The Debtors' principal operations consist of (i) acquiring, developing and operating timeshare resorts, marketed by the Debtors as vacation ownership resorts, (ii) marketing and selling vacation ownership interests in the timeshare resorts, which typically have entitled the buyers thereof to use of a fully-furnished unit for a one-week period on either an annual or an alternate year (i.e., biennial) basis ("Vacation Ownership Interests" or "VOI"), and (iii) providing purchase money financing to the buyers of Vacation Ownership Interests at its resorts. In addition, the Debtors receive revenues from the rental of the unused or unsold inventory of units at its vacation ownership resorts, from the operating portion of homeowner dues from owners of Vacation Ownership Interests and from the sale of food, beverages and other services at such resorts. The resorts and VOIs include the Los Abrigados Resort and Spa in Sedona, Arizona, the Inn at Los Abrigados in Sedona, Kohl's Ranch Lodge in Payson, Arizona, the Historic Crag's Lodge at Golden Eagle Resort in Estes Park, Colorado, the Sea of Cortez Premiere Vacation Club in San Carlos, Sonora, Mexico, the Premiere Vacation Club at Bell Rock,

in the Village of Oak Creek, Arizona, Rancho Manana Resort (which is currently closed) in Cave Creek, Arizona, Premiere Vacation Club at the Roundhouse Resort in Pinetop/Lakeside, Arizona, the Varsity Club facility in South Bend, Indiana, the Varsity Club facility in Tucson, Arizona, the VOIs in the Carriage House in Las Vegas, Nevada, VOIs in the Scottsdale Camelback Resort in Scottsdale, Arizona, and VOIs in the Roundhouse Resort located adjacent to Premier Vacation Club at the Roundhouse Resort.

In January 1998, the Company recorded in Maricopa County, Arizona its proprietary Premiere Vacation Club Membership Plan and in May 1998 annexed a total of 5,000 Vacation Ownership Interests into the Club and received Department of Real Estate approval in the State of Arizona to commence selling Vacation Ownership Interests in Premiere Vacation Club. The Company has since annexed additional units and as of December 31, 2008, Premiere Vacation Club included a total of 25,700 Vacation Ownership Interests. The 25,700 Vacation Ownership Interests annexed into the Club consist of 4,884.5 Vacation Ownership Interests in Los Abrigados (including the Celebrity House and the Winner's Circle suites), 340.5 Vacation Ownership Interests in the Inn at Los Abrigados, 2,998 Vacation Ownership Interests in Kohl's Ranch Lodge, 1,212 Vacation Ownership Interests in the Golden Eagle Resort, 1,500 Vacation Ownership Interests in the Sea of Cortez Premiere Vacation Club, 3,028.5 Vacation Ownership Interests in VCA-South Bend, 2,906.5 Vacation Ownership Interests in VCA-Tucson, 1,092 Vacation Ownership Interests in Premiere Vacation Club at the Roundhouse Resort, 194 Vacation Ownership Interests in the Roundhouse Resort, 2,233 Vacation Ownership Interests in the Carriage House, 4,420 Vacation Ownership Interests in Premiere Vacation Club at Bell Rock, 717 Vacation Ownership Interests in Rancho Manana Resort and 174 Vacation Ownership Interests in the Scottsdale Camelback Resort.

1
2
3

It is anticipated that substantially all of Debtors' interests in these resort assets will be sold as a part of the Plan to ILX Acquisitions, Inc. or another successful bidder at the Confirmation hearing.

4
5
6
7

In addition, ILX acquired approximately 2.1 acres of land in Puerto Penasco ("Rocky Point"), Mexico. The Debtors' carrying cost of this property is approximately $1,100,000, but, given the volatile real-estate market, its present value is unknown. Under the Plan this Rocky Point property will be transferred to the ILX Liquidating Trust.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Debtors also own about 20 acres in Sedona. About 17 acres, which are undeveloped, are subject to Textron Financial's security interest. Based on the appraisal obtained by Textron Financial in November 2009 the current value of the approximate 14 acres is approximately $3.1 million and the approximate 3 acres is $1.4 million. Debtors believe the remaining 3 acre parcel, and a separate residence, which are subject to liens in favor of Resort Funding and Irwin Union, have values approximating the respective security interests therein. Under the Plan, Textron Financial or its nominee will receive on the Effective Date a special warranty deed to the approximate 14 acres (known as the "USFS Land"). Also on the Effective Date, provided ILX Acquisition, Inc. is the Buyer, Textron Financial will place into escrow pursuant to the Escrow Agreement $2.1 million plus an interest reserve for 6 months at the rate of 12% per annum for the benefit of the Stock Pool. At its option at any time during the 6 month period, Textron Financial will pay the $2.1 million plus interest through the date of the payment through the Escrow to the Stock Pool. The remaining unearned interest will be returned to Textron Financial. Notwithstanding any of the foregoing, the funds held in escrow will be transferred to the Stock Pool no later than the date that is six months after the Effective Date. The Escrow Agreement is attached hereto as <u>Exhibit "C"</u>.

The approximate 3-acre portion of the 17 acres described above claimed as collateral by Textron, which 3-acres is subject to a senior lien in favor of M&I, will be transferred to the ILX Liquidating Trust subject to the M&I lien and sold. M&I will be paid its debt and the remaining proceeds will remain in the ILX Liquidating Trust. Under the Plan, provided ILX Acquisition, Inc. is the Buyer, Textron Financial will release its lien on this property for the benefit of the ILX Liquidating Trust. The other 3-acre parcel and a separate residence, which are subject to liens in favor of Resort Funding and Irwin Union, will be returned to their respective creditors.

Debtors own an approximate 5 acre site in Bullhead City, Arizona that is zoned multi-family. The Debtors' carrying cost for this property is approximately $565,000, but, given the volatile real-estate market, its present value is unknown. The Bullhead City property will be transferred to the ILX Liquidating Trust.

Under the Plan, when the Sale closes, the Debtors' operations of the resorts will cease but it is anticipated that the Buyer will continue the operations of the resorts and hire the majority of the Debtors' employees, although no decisions have been made.

## V. CAUSES OF ACTIONS

The Debtors are not aware of any claims or causes of action under section 544 or 1123, or any avoidance actions under sections 546, 547, 548, or 549 of the Bankruptcy Code. None of the Debtors' state or federal causes of action, including avoidance actions under §§ 544, 546, 547, 548 or 549 of the Bankruptcy Code, are being reserved or transferred to the ILX Liquidating Trust, except those permitted by the Liquidating Trust Agreement related to property conveyed to the Liquidating Trust.

## VI. SIGNIFICANT EVENTS DURING THE CHAPTER 11

### A. Administrative Proceedings

The Debtors filed their Petitions under Chapter 11 of the Bankruptcy Code on March 2, 2009. A first meeting of creditors was held on May 1, 2009.

### B. Retention of Professionals

The Debtors retained Polsinelli Shughart P.C. ("PS") to act as its bankruptcy counsel. The Court signed an Order approving the retention of PS on March 9, 2009.

By application made May 1, 2009, and Order of the Court entered May 7, 2009, the Debtors retained Hansen, Barnett & Maxwell P.C. to review and audit the Debtors' financial statements and tax filings.

On July 14, 2009, the Debtors applied for authority to retain Green Street Capital Group, LLC to serve as their financial and restructuring advisor. An Order was entered by the Court authorizing such retention on August 11, 2009.

On August 13, 2009, the Debtors filed their Motion for Order Authorizing Retention and Compensation of Professionals Used in the Ordinary Course of Business, seeking permission to retain, and subsequently compensate, several professionals who had provided the Debtors services unrelated to their restructuring. An Order granting the motion was ultimately entered.

### C. First Day Motions

The Bankruptcy Court approved the following First Day Motions on or about March 3, 2009:

1. Ex Parte Motion for an Order Authorizing and Directing (1) Joint Administration; (2) Transfer and Assignment of Cases to One Judge; and (3) Use of a Consolidated Caption;

2.      Motion for Leave to Use Debtor Maintained Matrices for Required Noticing and     Delivery of Filings to Appropriate Interested Parties; and Establishment of Notice Procedures;

3.      Motion for Order: (1) Authorizing the Debtor ILX Resorts Incorporated to Pay Unpaid Prepetition Wages, Salaries and Employee Benefits; and (2) Directing All Banks to Honor Prepetition Checks for Payment of Such Prepetition Claims;

4.      Motion for Authority to: Allow the Main ILX Operating Account to Remain Open for a Limited Period so that Prepetition Checks Can Clear from that Account; and to Continue Use of Certain Existing Bank Accounts and the Debtors' Cash-Management System;

5.      Emergency Motion for Order Authorizing and Approving Debtors' Use of Funds Claimed as Cash Collateral.

**D.      Other Bankruptcy Court Orders**

To date, the Bankruptcy Court has approved various motions for relief designed to allow the Debtors to continue normal operations. The Bankruptcy Court has issued numerous Orders, including an Order Authorizing Debtors' Continued Use of Cash Collateral, entered August 4, 2009, allowing the use of certain cash collateral, and multiple stipulated Orders continuing such use thereafter.

**E.      Claims Bar Date**

On July 28, 2009, the Debtors filed a Motion to Set Bar Date for Pre-Petition Claims, and an Order setting September 15, 2009 as the bar date for all pre-petition claims not included in the Debtors schedules, or scheduled as disputed, contingent, or unliquidated, was signed by the Court on August 3, 2009.

**F.      Motions for Relief from the Automatic Stay**

Textron Financial and Irwin Union Bank filed Motions for Relief from the Automatic Stay. The Debtors have responded to each. A final hearing on Textron's Motion was set for a full evidentiary hearing on November 10 and 12, 2009 and January 7, 2010. No hearing was set on Irwin Union's Motion. Because Textron Financial claims a substantial portion of the Debtor's assets as its collateral, if Textron's Motion is successful, it is not likely the Debtors will be able to reorganize without Textron Financial's consent. At the hearing on January 7, 2010, Debtors and Textron Financial reached a resolution that resulted in the filing of a Joint Plan and the proposed Sale of substantially all the Debtors' assets.

### G.     Debtors' Initial Plan of Reorganization

On August 28, 2009, Debtors filed their initial Plan of Reorganization and filed their First Amended Plan of Reorganization on October 2, 2009. Their Disclosure Statement was subsequently approved and the Debtors' solicited votes. Textron Financial objected to the Plan on numerous grounds. A contested evidentiary hearing was held in conjunction with the Textron Financial Motion for Stay Relief on November 10 and 12, 2009 and on January 7, 2010. Prior to the conclusion of the hearing, the Debtors and Textron Financial reached a resolution that resulted in the filing of the Joint Plan and the proposed Sale of substantially all the Debtors' assets.

### H.     Joint Plan and Settlement

During the January 7, 2010 Confirmation hearing and Motion for Stay Relief hearing involving Textron Financial and Debtors, the parties reached a consensual resolution for the Chapter 11 bankruptcy. That agreement is incorporated into the Joint Plan and this Disclosure Statement and approval of the Sale and will be sought as a part of the new Plan, Disclosure Statement and confirmation process.

## VII.   DESCRIPTION OF LIABILITIES OF THE DEBTORS

The liabilities of the Debtors are described in the Annual Report prepared by Debtors' management. Information regarding the Debtors' liabilities can also be found in the Plan, the Disclosure Statement and the Debtors' Schedules and Statement of Financial Affairs. Based on the Debtors' best estimates, their liabilities may be summarized as follows:

### A.    Priority Claims

The Debtors expect that, at the time of confirmation, they will have priority obligations of $614,667 arising from post-petition deferred compensation claims entitled to administrative priority, $44,976 arising from pre-petition deferred compensation claims entitled to priority, $400,000 arising from unpaid attorneys' fees and costs, $325,000 in post-petition accrued vacation compensation claims entitled to priority, $200,000 arising from severance compensation claims entitled to priority, and $70,874 in payroll tax obligations related to the foregoing claims. In addition, Debtors will have obligations incurred in the ordinary course of their business to employees and vendors, which are entitled to a priority. Lastly, and only upon the filing of a fee application and an Order of the Court authorizing payment thereof, the Debtors may have as much as $25,377 in fees payable to Green Street Capital Group.

### B.    Secured Claims

### Secured Claims of Textron Financial Corporation

Textron Financial Corporation ("TFC") holds secured claims as follows:

(1)    Secured Construction and Mortgage Loan with a principal balance listed in the Schedules in the approximate amount of $11,065,687, plus interest and fees. The Claim is fully secured by a valid and perfected first lien on multiple parcels of real estate and personal property.

(2)     USFS Land Mortgage Loan with a principal balance listed in the Schedules in the approximate amount of $4,577,706, plus interest and fees. The Claim is fully secured by a valid and perfected first lien on a parcel of real estate in Sedona, Arizona and personal property.

(3)     TFC Hypothecation Line of Credit ("Receivables Loan") with a principal balance listed in the Schedules in the approximate amount of $12,038,414, plus interest and fees. The Claim is fully secured by a valid and perfected first lien on certain receivables, along with certain real and personal property.

### Secured Claims of Irwin Union Bank, FSB

Irwin Union Bank, FSB or its successor in interest ("Irwin Union") holds secured claims as follows:

(1)     Secured Real Estate and Personal Property Loan alleged to be encumbering a timeshare hotel in Mishawaka, Indiana, with a principal balance listed in the Schedules in the approximate amount of $3,254,275.

(2)     Secured Real Estate Loan alleged to be encumbering a residence in Sedona, Arizona, with a principal balance listed in the Schedules in the approximate amount of $767,268.

### Secured Claims of Resort Funding, LLC

Resort Funding, LLC ("Resort Funding") holds two claims which are secured.  One is a real estate loan in the approximate amount of $2.0 million and the other relates to a sale with recourse of timeshare contracts by the Debtors to Resort Funding.

### Secured Claims of US Bank, National Association

US Bank National Association ("USB") holds a claim consisting of an Allowed Secured Claim secured by real property and personal property of one or more of the Debtors. USB has filed a timely proof of claim in the approximate amount of $644,169.80

secured by a parcel of real estate in Sedona, Arizona. As USB is oversecured, it is also entitled to recover its attorneys' fees and costs incurred, subject to a determination by the Court that such fees and costs are reasonable.

### Secured Claim of M&I Marshall & Ilsley Bank

M&I Marshall & Ilsley Bank ("M&I") holds a claim in the approximate amount of $290,000 secured by a lien on certain timeshare notes receivable and a replacement lien on certain real property.

### Secured Claim of The Steele Foundation. Inc.

The Steele Foundation, Inc. ("Steele Foundation") holds a claim in the approximate amount of $214,350 secured by a junior lien on certain timeshare notes receivable holdbacks and, also, by a lien on certain treasury stock of ILX.

### Secured Claim of Arizona Bank & Trust Co.

Arizona Bank & Trust Co. ("AZB") holds a claim in the approximate amount of $88,491 secured by a lien on certain real property and personal property located adjacent to Kohl's Ranch, in Gila County, Arizona.

### Secured Claim of Brentwood Credit Corporation

Brentwood Credit Corporation ("Brentwood") holds a claim in the approximate amount of $111,184 secured by a lien on certain furniture and equipment.

### Secured Claim of Netbank Business Finance

Netbank Business Finance ("Netbank") holds a claim in the approximate amount of $45,168 secured by a lien on furniture and equipment.

### Secured Claim of GMAC Financial Services

GMAC Financial Services ("GMAC") holds a claim in the approximate amount of $18,090 secured by a lien on a 2007 Chevrolet van.

### Secured Claims of Maricopa County.

The County of Maricopa, Arizona ("Maricopa County") holds a claim for property taxes in the approximate amount of $17,199 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Maricopa County.

### Secured Claims of Yavapai County

The County of Yavapai, Arizona ("Yavapai County") holds a claim for property taxes in the approximate amount of $57,122 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Yavapai County.

### Secured Claims of Coconino County

The County of Coconino, Arizona ("Coconino County") holds a claim for property taxes in the approximate amount of $277,825 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Coconino County.

### Secured Claims of Navajo County

The County of Navajo, Arizona ("Navajo County") holds a claim for property taxes in the approximate amount of $11,042 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Navajo County.

### Secured Claims of Gila County

The County of Gila, Arizona ("Gila County") holds a claim for property taxes in the approximate amount of $40,867 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Gila County.

### Secured Claims of Mohave County

The County of Mohave, Arizona ("Mohave County") holds a claim for property taxes in the approximate amount of $1,655 that is secured by a Senior Secured Claim in certain of the Debtors' real property located within Mohave County.

**Secured Claims of Pima County**

The County of Pima, Arizona ("Pima County") holds a claim for property taxes in the approximate amount of $82,050 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Pima County.

**Secured Claims of St. Joseph County, Indiana**

St. Joseph County, Indiana ("St. Joseph County") holds a claim for property taxes in the approximate amount of $190,344 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within St. Joseph County.

**Secured Claims of Larimer County, Colorado**

The County of Larimer, Colorado ("Larimer County") holds a claim for property taxes in the approximate amount of $19,977 that is secured by a Senior Secured Claim in certain of the Debtors' and ILX Resorts Affiliates' real property located within Larimer County.

C.    **Unsecured Claims**

**Unsecured Claims of Trade Creditors**

The Debtors estimate that trade creditors currently hold pre-petition unsecured claims in the approximate amount of $488,253.

**Unsecured Claims Arising from Rejected Executory Contracts and Unexpired Leases**

The Debtors estimate that parties to rejected contracts and leases currently hold unsecured claims in the approximate amount of $1,322,387. The Debtors estimate that the rejection of additional executory contracts and unexpired leases on the Confirmation Date could increase this amount to approximately $1,393,202.

**Unsecured, Disputed, Contingent, or Unliquidated Claims**

The Debtors estimate that creditors currently hold disputed, contingent, or unliquidated claims, which are not yet allowed, in the approximate amount of $322,340.

**Claims of Outstanding Check Payees**

There currently exist checks issued prior to the Petition Date totaling approximately $259,375 (includes $25,170 that is also included in unsecured, disputed, contingent or unliquidated above) that have not been cashed. A portion of the payees of these checks may be barred, by Order of the Court, from receiving payment.

**General Unsecured Claims**

The Debtors estimate that creditors currently hold unsecured claims, not described above, in the approximate amount of $1,032,634.64.

**D.    Administrative Expenses**

The Debtors anticipate the administrative expenses will consist primarily of attorneys' fees for PS. PS received, and has used, a pre-petition retainer. The Debtors anticipate that the unpaid attorneys' fees and costs incurred through confirmation will be approximately $400,000.00.

In addition, Debtors will have obligations incurred in the ordinary course of their business to vendors, which are entitled to administrative priority. Debtors also retained Green Street Capital Group to serve as financial and restructuring advisor. On or about August 11, 2009, Debtors funded a retainer in the amount of $75,000 against which Green

Street has charged for its services.  The Debtors, pursuant to cash collateral orders entered by the Court, delivered to Green Street $30,000 to replenish this retainer.  Upon the filing of a fee application and an Order of the Court authorizing payment thereof, the Debtors may have as much as $25,377 in fees payable to Green Street Capital Group.

In addition, the Debtors will have approximately $1,210,451 in post-petition vacation, severance, and deferred executive compensation claims, and tax obligations associated therewith, that are entitled to administrative priority.

There may be additional administrative expenses for related costs such as accountants, consultants, experts and appraisal fees, but they should not be material.

## VIII.  **PLAN PROVISIONS**

**THE FOLLOWING STATEMENTS CONCERNING THE PLAN ARE MERELY A SUMMARY OF THE PLAN AND ARE NOT COMPLETE. THE STATEMENTS ARE QUALIFIED ENTIRELY BY EXPRESS REFERENCE TO THE PLAN. CREDITORS ARE URGED TO CONSULT WITH COUNSEL OR EACH OTHER IN ORDER TO UNDERSTAND THE PLAN FULLY. THE PLAN IS COMPLETE, INASMUCH AS IT PROPOSES A LEGALLY BINDING AGREEMENT BY THE DEBTORS AND ALL THE PARTIES IN THE BANKRUPTCY. AN INTELLIGENT JUDGMENT CANNOT BE MADE WITHOUT READING IT IN FULL.**

The following analysis applies to the Sale and treatment of creditors and parties-in-interest under the Plan only in the event that ILX Acquisition, Inc. is the Buyer.  In summary, the Plan provides for (1) the Sale of substantially all of the assets of Debtors to a third party, (2) payment from the Sale Proceeds and cash on hand of all Allowed Administrative and Priority Claims and pre and post confirmation operating expenses, (3) payment of Allowed Secured Claims from the Sale Proceeds of the assets subject to their lien, (4) return of collateral to holders of certain Secured Claims, (5) creation of an ILX Liquidating Trust for the benefit of the Allowed Unsecured Claims, (6) transfer of certain real property, residual rights to proceeds, and other assets not sold to the ILX Liquidating Trust, (7) creation of a Stock Pool for the benefit of the holders of ILX Stock, (8) transfer

by Textron Financial to the ILX Stock Pool of $2.1 million from its own funds, (9) retention of the corporate shell, the related income tax benefits, and certain merchant deposits for the ILX Stock Pool, and (10) the settlement and release of causes of action against Textron Financial and the allowance of its claim and the validity and priority of its security interests.

The Plan Proponents have received a stalking horse Sale offer for substantially all of the Debtors' assets from ILX Acquisition, Inc. for $29,672,251. The sale is subject to higher and better bids.

Upon confirmation of the Plan and the close of the Sale, through the combination of Sale proceeds and cash on hand, all pre and post confirmation operating expenses, administrative expenses, and priority claims will be paid in full. Additionally, through some combination of cash payment and surrender or liquidation of collateral, pursuant to the Plan, all Allowed Secured Claims, except that of Textron Financial, will be paid in full. The Claim of Textron Financial, as compromised, and assuming ILX Acquisition, Inc. is the Buyer, shall be deemed to be paid as compromised on the Effective Date when its debt and liens related to purchased assets are assumed subject to the liens of Textron Financial on terms and conditions mutually agreed to by ILX Acquisition, Inc. as the Buyer and Textron Financial as a part of a Sale, and when the USFS Land is transferred to Textron Financial or its nominee by Debtors free and clear of liens other than Textron Financial's.

Pursuant to the Plan, certain assets including (1) Debtors' interest in unsold real estate located in Sedona, Arizona, Bullhead City, Arizona and Puerto Penasco, Mexico, (2) residual proceeds from consumer payments on non-eligible pre-petition note receivables that were less than 90 days delinquent as of the Petition Date (after the Buyer collects $500,000 in consumer payments including discounts given in settlement and

upgrades plus applicable servicing fees), (3) the residual interest in the "reserve" of Resort Funding and Steele Foundation; and (4) $10,000 in cash shall be transferred to the Liquidating Trust. The remainder of the Sale proceeds and the Debtors' cash-on-hand that is not budgeted or reserved for payment of pre-confirmation and post-confirmation operating expenses will on the Effective Date be transferred to and held in an interest bearing escrow account at an escrow company mutually agreeable to Debtors and Textron Financial and will be disbursed upon mutual agreement of the Reorganized Debtors and Textron Financial for payment of additional pre-confirmation or post-confirmation operating expenses or upon Court order. Once all pre-confirmation payments and post-confirmation payments are made by the Reorganized Debtors as provided for in the budget and reserves and if needed the escrow account, any additional unused cash shall be transferred to the Liquidating Trust. The cash and proceeds received through liquidation of the above-referenced assets will be disbursed pro rata to the Debtors' unsecured creditors.

Although subject to Court approval, the Plan Proponents are recommending that David Reaves serve as the Liquidating Trustee. Mr. Reaves has no connection with the Debtors, creditors, or equity holders in this bankruptcy. Mr. Reaves resume is attached hereto as Exhibit "H".

As part of the Plan, Debtors' interest in a merchant deposit account at First Data Services, LLC; an interest in the Escrow set up pursuant to the Escrow Agreement for the payment of $2.1 million; and any tax refunds and rights to future tax refunds shall be transferred to the Stock Pool and governed and disbursed to the holders of ILX Stock pursuant to the Stock Pool Disbursing Agreement (the "Stock Pool Disbursing Agreement") attached hereto as Exhibit "A".

In the event that any party other than ILX Acquisition, Inc. is the Buyer, its

approved bid must provide at least the same amount of cash for pre and post confirmation operating expenses, administrative expenses, and priority claims, and the same payment to creditors, other than Textron Financial, (including funding the Liquidating Trust) and equity holders (including funding the Stock Pool) that would be made if ILX Acquisition Inc. were the Buyer, and any additional amounts required by any orders entered by the Court governing the Sale process. Additionally, to the extent that a Buyer other than ILX Acquisition, Inc. does not have an agreement with Textron Financial, it must pay Textron Financial's Allowed Secured Claim in full, in cash, on the Effective Date, or as otherwise agreed by the Debtors, Textron Financial and the Buyer.

Upon the closing of the Sale, it is anticipated that the operations of the resorts will transfer to the Buyer and the business operations of the Debtors will cease, except for the winding down of their business operations which will be carried out by the Reorganized Debtors. It is anticipated that Debtor ILX will continue to exist and shall not be dissolved, pending further action of its Board. ILX shall become a privately held company and its stock shall no longer be listed on any public exchange, or sold on any public exchange. Depending upon the final terms of any sale to the Buyer, it is anticipated that Debtors ILE Sedona Incorporated, Los Abrigados Partners Limited Partnership, ILX-Bruno LLC, Puerto Penasco Vacation Destinations, S. de R.L. de C.V., Sea of Cortez Premiere Vacation Club, S. de R.L. de C.V., Rocky Point Genesis Incorporated, Premiere Development Incorporated, VCA South Bend Incorporated, VCASB Partners General Partnership, VCA Tucson Incorporated, ILX Bell Rock Incorporated and Harbor Southwest Development Inc., ILX Tourist Station Incorporated, Genesis Investment Group Inc. and First Piggy LLC may be terminated after the Effective Date.

## IX.  LIQUIDATION ANALYSIS

The following is a Liquidation Analysis indicating what the Debtors believe its creditors would receive in the event of a prompt disorderly liquidation.

The Sale of the assets contemplated by the Plan and the creation of the ILX Liquidating Trust and Stock Pool are expected to pay many Claims and Interests. Liquidation of the Debtors' assets is not likely to produce any dividend to unsecured creditors. As is set forth herein, virtually all of the Debtor's assets are subject to liens securing various loans. The Debtor's unencumbered property consists principally of two pieces of real estate, approximately 5 acres of land in Bullhead City, Arizona, and 2.1 acres in Puerto Penasco, Mexico. The Debtors estimate the carrying cost of these two parcels is approximately $1,700,000, but the current market value is unknown. The remainder of the Debtors' property is encumbered by one or more liens. In a liquidation, the extent to which any equity existed in the Debtors' assets would be substantially diminished or entirely lost because secured creditors could declare a default and charge default interest at much higher rates than is being paid under the Plan.

The Plan provides for the orderly Sale of the assets and the orderly liquidation of the remaining assets by the Liquidating Trust and the Stock Pool. The Plan anticipates paying all Allowed Administrative, Priority and most Secured Claims immediately in full, plus provides for the orderly liquidation of other assets for the benefit of unsecured creditors. Assuming ILX Acquisition, Inc. is the Buyer, the Plan also provides for the waiver of certain liens by Textron Financial and the transfer of such assets free of Textron Financial's liens which may result in more recovery for Allowed Unsecured Claims and Class 5 Interests. If the estate is liquidated in a "fire sale" manner, after payment of administrative claims, it is highly unlikely that general unsecured creditors or equity interests will receive any consideration.

The Debtor has not obtained a "liquidation appraisal" and the statements made above are based on the loan documents in place and the Debtors' best estimate of what will happen in a liquidation scenario.

## X. TAX CONSEQUENCES

Pursuant to § 1125(a)(1) of the Bankruptcy Code, the Debtors are to provide a discussion of the potential material federal tax consequences of the Plan to the Debtors, any successor to the Debtors, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the Plan, but adequate information need not include such information about any other possible or proposed plan. In determining whether the Disclosure Statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

Neither the Debtors, Textron Financial nor their lawyers can make any statements with regard to the tax consequences of the Plan with respect to any of the creditors or equity interests. Although they would note that to the extent a creditor's Allowed Claim is not paid in full, they should consult with their tax advisor concerning the possibility of writing off for tax purposes that portion of their Allowed Claim that is not paid. Each creditor in this case, when analyzing the Plan, should consult with its own professional advisors to determine whether or not acceptance of the Plan by the creditor will result in any adverse tax consequences to the creditor.

The Bankruptcy Tax Act generally provides that the Debtor does not have to recognize income from the discharge of indebtedness. While the amount of indebtedness discharged by the Plan is uncertain, it is unimportant because the Debtor is in bankruptcy,

and as such, it will not have to recognize the discharge of indebtedness as income for tax purposes.

## XI. SETTLEMENTS AND RELEASES UNDER THE PLAN

Pursuant to the agreement between Textron Financial and Debtors, on the Effective Date any and all claims and Causes of Action by any of the Debtors against Textron Financial, and its officers, directors, agents and professionals are released and waived, including but not limited to, any challenges to the validity and priority of any of its liens or security interests in Debtors' assets, provided however that the Textron Financial obligations under the Plan are not released. As discussed in the Plan, and Disclosure Statement, pursuant to Section 1123 of the Code and Rule 9019, and in consideration for the benefits provided herein by Textron Financial to the other Classes and Interests, and as a result of arm's-length negotiations, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all causes of action against Textron Financial, including the amount of its Claim, and the priority, validity, and extent of its Allowed Secured Claims. The Confirmation Order will constitute the Court's finding and determination that the settlement and release are in the best interest of the Debtors, the Estates and the holders of Claims and Interests, are fair and equitable, are made in good faith, and are approved by the Court pursuant to Section 363 and Rule 9019.

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a discharge, effective as of Confirmation, of any and all debts of the Debtors, that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141 (d)( 1) of the Bankruptcy Code. The discharge shall be effective as to each Claim, regardless of whether a proof of claim thereon was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan.

The entry of the Confirmation Order shall act as a full and complete release of the Debtors' and ILX Resorts' Affiliates' current and former officers, directors, employees, attorneys, agents, brokers, advisors, shareholders, representatives, and professionals and their affiliates, heirs, assigns and successors, from any and all claims and causes of action relating to the business conducted by the Debtors or the ILX Resorts Affiliates, the Plan, and the contemplated Sale under the Plan, except that the Debtors and Reorganized Debtors are required to perform their obligations and duties under the Plan, the Escrow Agreement and the Asset Purchase Agreement.

## XII.   **VOTING PROCEDURE**

The Plan divides the claims of creditors and of interest-holders into separate classes. All classes of claimants are encouraged to vote; however, only the vote of holders of claims that are impaired by the Plan will have a significant impact upon the confirmation process. Generally, this includes creditors who, under the Plan, will receive less than payment in full of their claims on the Effective Date of the Plan.

All creditors entitled to vote on the Plan must cast their vote by completing, dating and signing the ballot which has been mailed to them together with the Disclosure Statement. The ballot contains instructions concerning the deadline for submitting the ballot and to what address the ballot should be mailed.

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with §1125 of the Bankruptcy Code, and is provided to each person whose claim or interest has been scheduled by the Debtors, or who has filed a proof of claim or interest with respect to the Debtors or property of a Debtor, each known equity interest holder, and other parties-in-interest known to the Debtors. The Disclosure Statement is intended to assist creditors in evaluating the Plan and in determining whether to accept the Plan. In determining acceptance of the Plan, votes of creditors will only be counted if

submitted by a creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and liquidated, or who has timely filed with the Court a proof of claim or proof of interest.

## XIII.       <u>MODIFICATION OF THE PLAN</u>

In addition to their modification rights under §1127 of the Bankruptcy Code, the Plan Proponents jointly may amend or modify this Plan at any time prior to Confirmation without leave of the Court. The Plan Proponents may propose amendments and/or modifications of this Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors and Interests. After Confirmation of the Plan, the Liquidating Trust may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or Confirmation Order, as they pertain to the Liquidating Trustee's duties thereunder, if any may be necessary to carry out the purposes and intent of this Plan. Similarly, after Confirmation of the Plan, the Disbursing Agent may, with approval of the Court, as long as it does not materially or adversely affect the rights and Claims of the holders of Class 3 Claims and other Claimants, or the rights of Interests, remedy any defect or omission or reconcile any inconsistencies in the Plan or Confirmation Order, as they pertain to the Disbursing Agents duties thereunder, if any may be necessary to carry out the purposes and intent of this Plan.

## XIV. <u>CLOSING OF CASE</u>

Until this case is officially closed, the Liquidating Trust will be responsible for filing post-Confirmation reports required by the United States Trustee for the applicable assets and distributions and paying the quarterly post-Confirmation fees associated therewith of the United States Trustee, in cash, pursuant to 28 U.S.C. § 1930, as amended, and the Disbursing Agent shall be responsible for filing such reports and paying such fees

associated with its assets and distributions. Pursuant to 11 U.S.C. § 1129(a)(12), all fees payable under section 1930 of title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## XV.  DISCLAIMER

Court approval of this Disclosure Statement and the accompanying Plan of Reorganization, including exhibits, is not a certification of the accuracy of the contents thereof.  Furthermore, Bankruptcy Court approval of these documents does not constitute the Bankruptcy Court's opinion as to whether the Plan should be approved or disapproved.

## XVI.  RISKS

The risk of the Plan lies essentially with the value of the assets and purchase of such assets by third parties.

## XVII. PROPONENTS RECOMMENDATION/ALTERNATIVES TO THE PLAN

The Plan Proponents recommend that all creditors entitled to vote for the Plan do so. The Plan would pay the Administrative, Priority and Secured Creditors through a Sale on a timely and prompt basis and provides a Liquidating Trust for the Unsecured Creditors and a Stock Pool for the holders of ILX Stock that will likely produce more money quickly and will allow more proceeds because of the waiver of certain liens by Textron Financial under the Plan. Some of the alternatives to confirmation of the Plan would be conversion of this case to Chapter 7 of the Bankruptcy Code or its dismissal.

Dismissal of this case would result in the foreclosure of the real property and other secured property by the secured creditors, and accrual and payment (to the extent funds are available) of default interest on those claims.

Conversion would result in the appointment of a Chapter 7 trustee and, most likely, the hiring of an attorney by the trustee. Expenses incurred in administering the Chapter 7 case would take priority in the right to payment over allowed, administrative expenses

incurred in the Chapter 11 case. Both Chapter 7 and Chapter 11 administrative expenses take priority over the payment of unsecured claims without priority. In other words, conversion would likely substantially decrease the net amount available to pay currently existing creditors.

The most likely effect of conversion of the case to a Chapter 7 would be either a "fire sale" of the properties at less than is owed to the secured creditors, or a foreclosure of the properties by one or more of those creditors.

For all these reasons, the Plan Proponents urge you to vote to accept the Plan and to return your ballots in time to be counted.

DATED this 17 day of May, 2010.

ILX RESORTS INCORPORATED,
For itself and all Debtors
By Polsinelli Shugart P.C.

By: _____
John J. Hebert

TEXTRON FINANCIAL CORPORATION

By: _____
Its: _____
ASSISTANT VICE PRESIDENT

- 31 -

Prepared and Submitted by Counsel:

**POLSINELLI SHUGART PC**

By: _____
John J. Hebert
Wesley Ray
Attorneys for Debtors


**FENNEMORE CRAIG PC**

By: _____
Cathy L. Reece
Keith L. Hendricks
Attorneys for Textron Financial Corporation

**ILX RESORTS INCORPORATED**, *et al.*,
Case No. 2:09-bk-03594-RTB

**LIST OF EXHIBITS TO DISCLOSURE STATEMENT**

Exhibit

A.     Stock Pool Disbursing Agreement

B.     To be supplemented with the Proposed Asset Purchase Agreement

C.     Escrow Agreement

D.     Legal Description for M&I Collateral

E.     ILX Liquidating Trust Agreement

F.     Statement of Sale and Transfer of Debtors' Assets

G.     Assumed Executory Contracts and Unexpired Leases

H.     Resume of David Reaves

I.     Estimated Budgets and Reserves